UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

LIZABETH J. AUGUSTINE, :

Plaintiff, : Case No. 1:07-cv-8362

- against - :

AXA FINANCIAL, INC. d/b/a AXA EQUITABLE LIFE INSURANCE CO. :

:

Defendant.

---------------------------------------------------------------- x

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff, Lizabeth J. Augustine ("Mrs. Augustine"), by and through counsel, The Roth Law Firm, PLLC, located at 545 Fifth Avenue, Suite 960, New York, New York 10017, and as and for her Complaint and Demand for Jury Trial against Defendant, AXA Financial, Inc. d/b/a AXA Equitable Life Insurance Co. ("AXA") states and alleges as follows:

**NATURE OF THE ACTION**

This is an action alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, retaliation and intentional infliction of emotional distress. Mrs. Augustine alleges that she was denied her entitlement to FMLA leave to care for her six year old daughter, Megan, who was born with a life threatening condition, Recurrent Respiratory Papillomatosis ("RRP"). She was denied the leave after turning in the necessary AXA request form *and* certification form from Megan's doctor. Not only, however, was the leave denied, but AXA swiftly retaliated against Mrs. Augustine for asking for the leave she was entitled to. Six days after Mrs. Augustine submitted the two forms, AXA made a decision, contained in a written memorandum, to terminate her.

## PARTIES

1. Mrs. Augustine is an individual citizen of the United States residing at 9 Painted Wagon Road, Holmdel, New Jersey 07733 and was an "eligible employee" of AXA within the meaning of section 101 of the FMLA, having worked for AXA in excess of 12 months and for the statutorily-mandated 1,250 hours.

2. Upon information and belief, AXA is a company authorized to do business in the State of New York maintaining its principal office at 1290 Avenue of the Americas, New York, New York 10104 and is an "employer" within the meaning of section 101 of the FMLA.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the claims arise under the laws of the United States, and in particular under the FMLA.

4. Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because AXA resides, for the purpose of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district, and because a substantial part of the events giving rise to the claims herein occurred in this district.

5. Section 107 of the FMLA permits Mrs. Augustine to proceed directly in this Court without resort to, or exhaustion of, administrative remedies.

## FACTUAL BACKGROUND

6. Mrs. Augustine worked for AXA from March 1, 1987 through March 2, 2007. Throughout those twenty years, Mrs. Augustine loyally and competently served AXA.

7.  In 2000, Mrs. Augustine gave birth to her only daughter, Megan. Five months later, Megan was diagnosed with Recurrent Respiratory Papillomatosis ("RRP"), which is a life threatening condition. As a result of this serious illness, to date, Megan has undergone approximately 50 surgeries and two experimental treatment protocols.

8.  In late November 2006, Megan began having severe RRP and reactive airway symptoms. Winter months are particularly stressful to RRP sufferers. Megan had to visit several doctors, including, but not limited to, a pediatrician and a pulmonary specialist, and ultimately required additional surgery.

9.  In order to care for Megan, Mrs. Augustine knew that she would need some time off from work. Thus, on December 14, 2006, Mrs. Augustine submitted to AXA a Request for Family Medical Leave, Personal Leave or Extended Leave ("Request for Leave").

10. In accordance with AXA policy, Mrs. Augustine attached to the Request for Leave a certification form issued by Megan's pediatrician. See Certification of Health Care Provider, a copy of which is annexed hereto as Exhibit A. The certification form explained that it would be "necessary…to take work only intermittently or to work on a less than full schedule as a result of the condition."

11. On December 20, 2006, six days after Mrs. Augustine submitted the Request for Leave, Defendants prepared an internal memorandum, stating that Mrs. Augustine's position, Client Relations Manager, was being replaced by a position called Junior Campaign Manager and that, therefore, Mrs. Augustine would be terminated. See Customer Marketing Group (12/20/06) December 2006 Reorganization: Justification Document, a copy of which is annexed hereto as Exhibit B.

12. Mrs. Augustine did not receive the internal memorandum. Instead, she repeatedly asked and anxiously waited for AXA to approve her Request for Leave so that she could care for Megan, but she kept getting the run around.

13. Finally, on January 31, 2007, Mrs. Augustine received a letter from AXA notifying her that she would be terminated. See correspondence from Ava Schoenberg on January 31, 2007, a copy of which is attached hereto as Exhibit C.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Violations of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.***

14. Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 13 above with the same force and effect as if fully set forth herein.

15. AXA refused to grant Mrs. Augustine's Request for Leave to care for her daughter, who has a serious health condition.

16. Mrs. Augustine's daughter's condition qualifies as a "serious health condition" in that it involves inpatient hospitalization and/or continuing treatment.

17. Any absences that Mrs. Augustine took during the time period relevant hereto were due to a circumstance permitted under the FMLA.

18. AXA, using the guise of eliminating Mrs. Augustine's position, discriminated against and terminated her because she submitted the Request for Leave.

19. Despite reasonable efforts, Mrs. Augustine has been unable to find comparable employment with comparable benefits.

20. As a proximate result of AXA's violations of the FMLA, Mrs. Augustine has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

21. As a further proximate result of AXA's violations of the FMLA, Mrs. Augustine has suffered and continues to suffer impairment and damage to Mrs. Augustine's good name and reputation by AXA.

22. As a further proximate result of AXA's violations of the FMLA, Mrs. Augustine has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish.

23. By reason of AXA's willful violations of the FMLA, Mrs. Augustine is entitled to all legal and equitable remedies available.

**AS AND FOR A SECOND CAUSE OF ACTION**

**Retaliation**

24. Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 23 above with the same force and effect as if fully set forth herein.

25. AXA, using the guise of eliminating Mrs. Augustine's position, retaliated against and terminated her because she submitted the Request for Leave.

26. Despite reasonable efforts, Mrs. Augustine has been unable to find comparable employment with comparable benefits.

27. As a proximate result of AXA's retaliation, Mrs. Augustine has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses,

deferred compensation, and other employment benefits.

28. As a further proximate result of AXA's retaliation, Mrs. Augustine has suffered and continues to suffer impairment and damage to Mrs. Augustine's good name and reputation by AXA.

29. As a further proximate result of AXA's retaliation, Mrs. Augustine has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish.

30. By reason of AXA's retaliation, Mrs. Augustine is entitled to all legal and equitable remedies available.

**AS AND FOR A THIRD CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

31. Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 30 above with the same force and effect as if fully set forth herein.

32. AXA, using the guise of eliminating Mrs. Augustine's position, intentionally inflicted emotional distress upon her because she submitted the Request for Leave.

33. AXA's intentional conduct, in denying Mrs. Augustine's entitlement to FMLA leave to care for her six year old daughter, Megan, who was born with a life threatening condition, Recurrent Respiratory Papillomatosis ("RRP"), was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

34. AXA's intentional conduct, in retaliating against Mrs. Augustine after she

requested FMLA leave to care for her six year old daughter, Megan, who was born with a life threatening condition, Recurrent Respiratory Papillomatosis ("RRP"), was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

35. Despite reasonable efforts, Mrs. Augustine has been unable to find comparable employment with comparable benefits.

36. As a proximate result of AXA's intentional infliction of emotional distress, Mrs. Augustine has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

37. As a further proximate result of AXA's intentional infliction of emotional distress, Mrs. Augustine has suffered and continues to suffer impairment and damage to Mrs. Augustine's good name and reputation by AXA.

38. As a further proximate result of AXA's intentional infliction of emotional distress, Mrs. Augustine has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish.

39. By reason of AXA's intentional infliction of emotional distress, Mrs. Augustine is entitled to all legal and equitable remedies available.

**JURY DEMAND**

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant judgment to her containing the following relief:

A. Back pay;

B. Actual monetary damages;

C. Liquidated damages;

D. Compensatory damages in the amount of $1,000,000.00;

E. Punitive damages in the amount of $1,000,000.00;

F. Attorneys fees;

G. Costs and disbursements;

H. Pre-judgment and Post-judgment interest; and

I. And any other such relief that this Court deems fair and just.

Respectfully submitted this 25 day of September, 2007.

THE ROTH LAW FIRM, PLLC

By: ______________________
Richard A. Roth (RAR-5538)

545 Fifth Avenue, Suite 960
New York, New York, 10017
(212) 542-8882

*Attorneys for Plaintiff*
*Lizabeth J. Augustine*

Case 1:07-cv-08362-RWS    Document 1    Filed 09/26/2007    Page 9 of 19

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division

*(When completed, this form goes to the employee,* ***Not to the Department of Labor.****)*

OMB No.: 1215-0181
Expires: 07/31/07

1. Employee's Name
LIZ AUGUSTINE

2. Patient's Name *(If different from employee)*
MEGAN McEVOY

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) ______ (2) ______ (3) ______ (4) ✓ (5) ______ (6) ✓ , or None of the above ______

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

Six year old with history of juvenile recurrent laryngeal papillomatosis requiring tracheostomy, recurrent airway surgery. No longer has tracheostomy but has long term airway and lung damage as a ~~result~~ result of condition and treatment

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

Commenced 7/00
duration - 5 years

b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

yes

If yes, give the probable duration: 5 years

c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

Chronic condition

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

6. a. If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

Cannot be predicted

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b. If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments: Patient sees a specialist in pulmonary medicine and a pediatric ENT specialist

c. If a **regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

Albuterol inhalation, oxygen as needed

antibiotics as needed

7. a. If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

b. If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

c. If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

[signature] — Signature of Health Care Provider

Pediatrics — Type of Practice

**UPTOWN PEDIATRICS**
Ramon J.C. Murphy, MD
John G. Larsen, MD Signe Larson, MD
Beth Cohen, MD Daniel Camen[illegible]n, MD
Ivanya L. Alpert, MD
1245 Park Avenue
New York, NY 10128
Tel: 212-427-0540 Fax: 212-534-1086

Address

Telephone Number

Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

Employee Signature

Date

A "**Serious Health Condition**" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

**Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

(a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

(1) **Treatment**[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

(2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

A **chronic condition** which:

(1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

(3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

A period of **Incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider.** Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or** for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment,** such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

***DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.***

*U.S. GPO: 2000-461-954/25305

Case 1:07-cv-08362-RWS    Document 1    Filed 09/26/2007    Page 14 of 19

# Customer Marketing Group (12/20/06)
# December 2006 Reorganization: Justification Document

## Background

The fundamental basis for the Customer Marketing Group's (CMG) current organization structure (Exhibit 1) was establishment of the group's business mission (drive New Business Value/NBV via customer-based marketing programs, executed in cooperation with and on the behalf of AXA Equitable's Retail and Wholesale/ADL business channels), by virtue of the Executive Management Council's approval of the 2006 – 2007 Marketing Plan in May 2006. The CMG organization was officially established at that time with reorganization at the VP and above levels, including installation of new leadership.

Accountabilities of the new leadership included identifying future changes to increase CMG's NBV productivity and efficiency in 2006 and beyond. The CMG structure below the VP levels in Exhibit 1 also reflects the immediate changes accomplished between May and July, 2006. The discussion below details the changes that CMG has anticipated and been working towards since Third Quarter 2006.

## New Requirements for Change

Four fundamental realities now substantiate the need for further change in the CMG organization structure to achieve necessary alignments that deliver its business mission. Those realities, each of which is associated with higher volume and increased performance of CMG programs, are:

   . The December 2006 completion of the Marketing Infrastructure RFP and establishment of a February 1, 2007 'go live' date for automated Print on Demand and Lead Management capabilities. This will increase CMG's scale and volume capacities to execute and evaluate acquisition, retention and cross-sales marketing programs.
   . The emergence of a business and resource allocation strategy for the Retail Channel. This will establish a more actionable and rational basis for investments, including marketing investments, down to the branch office level of the Retail organization.
   . The beginning of a similar movement toward strategic clarity and specificity on the ADL side of the business. This effort is expected to be completed by February 1.
   . The establishment of a more effective working partnership between CMG and Finance, with the particular benefit of a more actionable and transparent application of NBV principles, calculations and tracking. This will provide an enhanced basis for evaluating NBV potential of alternative marketing programs, as well portions of marketing programs.

## Summary of CMG Changes

The consistent themes for all December 2006 changes to the CMG organization are 1) the reconfiguration of positions and skills to more effectively drive NBV, 2) the elimination of positions that were previously focused on non-NBV efforts and/or efforts that no longer hold a strategic business priority for the company and 3) the shifting of resources to positions that directly support increased strategic effectiveness of marketing programs. Each of the changes is noted below, with further details in the attached position descriptions and Exhibits 1 and 2 organization charts.

Direct Reports to SVP, CMG

1. The two VP/AVP Wholesale Acquisition and AXA Advisor positions (Exhibit 1) are reconfigured to VP/AVP Marketing Development (Exhibit 2). The new position description (Exhibit 3) details the new focus on acquiring and assisting the development of ADL/Retail strategy, then developing supportive CMG strategy that drives CMG program activity. These positions more effectively become the ADL/Retail client business representative in CMG. The positions also manage all the communications flow between CMG and the respective client businesses. To accommodate this new focus, activities such as non-NBV event support and significant amounts of brochure development have been released to other organizations (acceptance pending). The two incumbents are assessed as having the necessary skills/qualifications to remain in place and in grade.
2. The VP Advertising, Brand/Acquisition & Diversity position (Exhibit 1) is reconfigured to VP Advertising & Brand (Exhibit 2). The new position description (Exhibit 4) reflects an increased focus on the strategic importance of advertising at both the Group (Paris) and company (US) levels, as well as recognizing the significant involvement of senior management (EVP/SVP) in this highly visible and heavily funded endeavor. In addition, the new focus removes acquisition activities (shifted to ARCS) and moves diversity advertising to the lower priority (and lower position), consistent with its business impact and funding. The incumbent is assessed as having the necessary skills/qualifications to remain in place.

Organizations Reporting to CMG VP's/AVP

3. Marketing Development (Retail): This organization is reduced from five associates to four, reflecting elimination of the AVP position that supported off-site events and the passing of those activities to the Retail and ADL organizations. Paul Donlon, AVP occupies this eliminated position but has accepted another position within AXA Equitable starting 1-1-07. Additionally, the remaining positions have been refocused to assist the VP's mission of more strategically driving the marketing support of the Retail organization. See Exhibits marked 'Retail 3a, 3b and 3c' for details. The incumbents in these remaining positions are assessed as having the necessary skills/qualifications to remain in place.
4. Marketing Development (ADL): This organization will shift one of its three reports (Exhibit 1) to ADL ARCS. The ADL ARCS organization will be formed

as a new sub-entity under the AVP, Marketing Development (ADL) during its development phase (estimated Jan. – June '07), then shifted to the VP ARCS when first half 2007 programs have been successfully launched and the ARCS organization has scaled the marketing infrastructure's learning curve (Exhibit 2). The two Marketing Development positions reporting to the AVP, Marketing Development ADL (see Exhibits: ADL 3D & 3E) will be configured similarly to their counterparts in the Marketing Development (Retail) organization, adjusted only for detail differences between Retail and ADL. All positions will require on-site presence, consistent with the needs of supporting ADL. All incumbents are assessed as having the necessary skills/qualifications to remain in Marketing Development or move to the ADL ARCS sub-unit. However, one associate (Joanne Bailey) does not meet the requirement to be on-site. She is not expected to relocate from her off-site location and will therefore be replaced. The Director, ADL ARCS and the three positions under it are new to the organization and reflect the increased importance of supporting ADL's growth with strategic marketing programs, consistent with the support historically given to Retail. These positions require direct marketing skills and experience not resident at any scale within the company. These will be external acquisitions, funded by elimination of positions inconsistent with CMG's new mission/priorities and/or shifting of FTE's (See Exhibit 1 where position eliminations are in yellow and shifts are outlined in light blue).

5. Advertising & Brand: The position of AVP, Diversity Advertising will be eliminated and its responsibilities transferred to the remaining lower level advertising positions, consistent with the lower business impact and funding of diversity programs. The impacted incumbent is Stella Stots, who is assessed as too senior for the remaining two positions. The other two Advertising incumbents are assessed as having the necessary skills/qualifications to remain in place.
6. Acquisition, Retention & Cross-Sales: The position of Client Relationship Manager was established in 2002 to support the corporate initiative to halt sales in Mississippi. An important part of that effort was to ensure effective service to existing clients in that state. The Client Relationship Manager accomplished that.. Now that AXA Equitable has returned to marketing in the state and CMG has been charged with the new task of driving NBV through customer-based marketing support of our field operations, the Client Relationship Manager position will be eliminated and replaced by a Junior Campaign Manager position (Exhibit 5). The incumbent, Liz Augustine, does not have the direct marketing skills that will be required going forward in the ARCS organization, including those of the replacement position.

All positions under the VP, Marketing Operations will remain unchanged at this time.

Signed: ______________________

James Dennis
SVP, Customer Marketing Group



**Ava Schoenberg**
Vice President
Employee Relations

January 31, 2007

Lizabeth J Augustine
9 Painted Wagon Road
Holmdel, NJ 07733

Steve Kessler
5059 Florence Hope
spoke 3/1/07
on leave until May

Dear Lizabeth:

This notification letter is to inform you that your job with AXA Equitable is being eliminated on March 02, 2007. As a result, you are eligible to receive severance benefits under the AXA Equitable Severance Benefit Plan for Eligible Employees and Eligible Officers ("Plan") that was in effect on December 31, 2006. In order to receive any severance benefits you must sign and return the enclosed Confidential Separation Agreement and General Release and not exercise any rights you may have to revoke such agreement and release. Your official 30-day Notification Period begins February 01, 2007.

If you obtain another position within the Company during the Notification Period, you will not be eligible for any severance benefits under the Plan, including severance pay.

Also enclosed for your review is a severance worksheet, and other materials relating to your job elimination including your summary plan description. Upon completion of enclosed documents please return them to the AXA Equitable Payroll Administration Office, SOC MD 33-2, 100 Madison Street, Syracuse, NY 13202, in the enclosed pre-addressed envelope.

Please note, if you choose to execute the Confidential Separation Agreement and General Release, the original signed and notarized document must be returned in its entirety to Ava Schoenberg, at AXA Equitable 1290 Avenue of the Americas, 7th floor, New York, New York 10104 in the enclosed pre-addressed envelope in order to receive your severance benefits.

If you need additional information concerning our outplacement services or any other related topics, please contact our HR Service Center at 1-800-829-2633.

I want to thank you for the contributions you made during the course of your employment and wish you the best of luck in the future.

Very truly yours,

Ava Schoenberg

Ava Schoenberg

**AXA EQUITABLE**

AXA Equitable, 1290 Avenue of the Americas, New York, NY 10104
Tel: (212) 314-2456 Fax: (212) 314-3582 ava.schoenberg@axa-equitable.com

E05107

www.axa-equitable.com